No. 23-1355

IN THE

# United States Court of Appeals
## FOR THE FEDERAL CIRCUIT

————————

**AMSTED RAIL COMPANY, INC.,
ASF-K DE MEXICO S. DE R.L. DE C.V.,
STRATO, INC., and TTX COMPANY,**

**Plaintiffs-Appellants,**

**and**

**WABTEC CORPORATION,**

**Plaintiff,**

v.

**UNITED STATES INTERNATIONAL TRADE COMMISSION
and ACTING SECRETARY KATHERINE M. HINER,
in her official capacity,**

**Defendants-Appellees,**

**and**

**COALITION OF FREIGHT RAIL COUPLER PRODUCERS,**

**Defendant-Intervenor-Appellee.**

————————

**On Appeal from the United States Court
of International Trade, Case No. 22-00307,
Judge Gary S. Katzmann**

————————

**PLAINTIFFS-APPELLANTS' OPENING BRIEF**

————————

Andrew T. Schutz
Ned H. Marshak
GRUNFELD, DESIDERIO,
LEBOWITZ, SILVERMAN &
KLESTADT LLP
599 Lexington Avenue, 36th Floor
New York, NY 10022
(212) 557-4000

*Counsel for Plaintiff*
*Strato, Inc.*

Jay I. Alexander
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

*Counsel for Plaintiff*
*TTX Company*

Douglas J. Heffner
Brian P. Perryman
Richard P. Ferrin
FAEGRE DRINKER
BIDDLE & REATH LLP
1500 K Street, NW, Suite 1100
Washington, DC 20005
(202) 230-5000

*Counsel for Plaintiffs*
*Amsted Rail Company, Inc. and*
*ASF-K de Mexico S. de R.L. de C.V.*

# CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellants Amsted Rail Company, Inc. and ASF-K de Mexico S. de R.L. de C.V. certify the following:

1.  The full name of every party or amicus represented by me is: Amsted Rail Company, Inc. and ASF-K de Mexico S. de R.L. de C.V.

2.  The names of the real parties in interest represented by me are: Amsted Rail Company, Inc. and ASF-K de Mexico S. de R.L. de C.V.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the real parties represented by me are: Amsted Rail Company, Inc. is the parent corporation of ASF-K de Mexico S. de R.L. de C.V. Amsted Industries, Inc. is the parent corporation of Amsted Rail Company, Inc. None of these are publicly held companies.

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial or agency or are expected to appear in this court are:

    Douglas J. Heffner
    Brian P. Perryman
    Richard P. Ferrin
    Carolyn Beathea Connolly
    FAEGRE DRINKER
    BIDDLE & REATH LLP
    1500 K Street, NW, Suite 1100
    Washington, DC 20005
    (202) 230-5000

5.  The cases known to me to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal are: None.

6.  Organizational victims in criminal cases and debtors and trustees in bankruptcy cases are: None.

i

Counsel for Plaintiff-Appellant Strato, Inc. certify the following:

1. The full name of every party or amicus represented by me is: Strato, Inc.

2. The names of the real parties in interest represented by me are: Strato, Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the real parties represented by me are: None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial or agency or are expected to appear in this court are:

   Andrew T. Schutz
   Ned H. Marshak
   GRUNFELD, DESIDERIO, LEBOWITZ,
   SILVERMAN & KLESTADT LLP
   599 Lexington Avenue, 36th Floor
   New York, NY 10022
   (212) 557-4000

5. The cases known to me to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal are: None.

6. Organizational victims in criminal cases and debtors and trustees in bankruptcy cases are: None.

Counsel for Plaintiff-Appellant TTX Company certify the following:

1.   The full name of every party or amicus represented by me is: TTX Company.

2.   The names of the real parties in interest represented by me are: TTX Company.

3.   All parent corporations and any publicly held companies that own 10 percent or more of the stock of the real parties represented by me are: Union Pacific Corporation, CSX Corporation, and Norfolk Southern Corporation, each of which is a publicly held company that owns 10% or more of the stock of TTX Company.

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial or agency or are expected to appear in this court are:

James M. Smith
Jay I. Alexander
Shara L. Aranoff
Sooan (Vivian) Choi
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

5.   The cases known to me to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal are: None.

6.   Organizational victims in criminal cases and debtors and trustees in bankruptcy cases are: None.

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ............................................. 1

STATEMENT OF THE ISSUES ................................................. 1

PRELIMINARY STATEMENT ................................................. 2

STATEMENT OF THE CASE ................................................... 6

    I.    The Commission's Trade Investigations ................................ 6

        A.    The Predecessor Investigations ................................. 6

        B.    The Current Investigations ......................................... 11

    II.    Litigation In The Trade Court ................................................ 16

        A.    Litigation With The Commission ................................. 16

        B.    Litigation With The Department ................................. 23

SUMMARY OF THE ARGUMENT ........................................ 27

ARGUMENT ................................................................................. 29

    I.    Standard Of Review ................................................................ 29

    II.    Jurisdiction Lies Under 28 U.S.C. § 1581(i) Because Plaintiffs' Remedies Under Other Subsections Of § 1581 Are Manifestly Inadequate ............. 30

        A.    In A Trade Investigation, The Harms A Former Client Faces From A Conflicted Legal Representation Cannot Be Remedied By *Ex Post Facto* Review Under § 1581(c) ................. 31

1.   This Court and others recognize the
     inadequacy of awaiting adjudications
     on the merits before deciding
     disqualification motions...................................... 31

2.   Subsection 1581(c) does not allow
     judicial review of agency decisions on
     attorney disqualification.................................... 40

B.   To Invoke Jurisdiction, Former Clients
     Should Not Be Put To The Self-Destructive
     Burden Of Revealing Which Confidences
     Could Be Used To Harm Them.................................. 43

C.   The Decisional Authorities On Which The
     Trade Court Relied Do Not Undermine §
     1581 Jurisdiction Here.................................... 50

1.   *Firestone* is not to the contrary........................... 50

2.   *Shakeproof*'s *dictum* is not to the
     contrary ........................................... 54

III.  The Trade Court Erred By Dismissing The
      Verified Complaint Without Leave To Amend..................... 55

CONCLUSION ......................................................... 59

# TABLE OF AUTHORITIES

*In re American Airlines, Inc.,*
    972 F.2d 605 (5th Cir. 1992) ....................................................... 33, 40

*Amsted Rail Co. v. U.S. International Trade Commission,*
    ___ F. Supp. 3d ___, No. 22-00307,
    2022 WL 17820551 (C.I.T. Dec. 20, 2022) ..................................... 22

*Amsted Rail Co. v. U.S. International Trade Commission,*
    ___ F. Supp. 3d ___, No. 22-00307,
    2022 WL 16959404 (C.I.T. Nov. 15, 2022) ...................................... 19

*Arthrocare Corp. v. Smith & Nephew, Inc.,*
    406 F.3d 1365, 1370 (Fed. Cir. 2005) ............................................. 59

*Astornet Technologies Inc. v. BAE Systems, Inc.,*
    802 F.3d 1271 (Fed. Cir. 2015) ....................................................... 59

*Atasi Corp. v. Seagate Technology,*
    847 F.2d 826 (Fed. Cir. 1988) .................................................. 46, 47

*Beer v. United States,*
    696 F.3d 1174 (Fed. Cir. 2012) ....................................................... 58

*Bowers v. Ophthalmology Group,*
    733 F.3d 647 (6th Cir. 2013) ........................................................... 34

*Cahill v. Merit Systems Protection Board,*
    821 F.3d 1370 (Fed. Cir. 2016) ....................................................... 59

*Cedars-Sinai Medical Center v. Watkins,*
    11 F.3d 1573 (Fed. Cir. 1993) ......................................................... 30

*Chugach Electric Association v. U.S. District Court,*
    370 F.2d 441 (9th Cir. 1966) ........................................................... 48

*Cord v. Smith,*
   338 F.2d 516 (9th Cir. 1959) ............................................................ 33

*In re Dresser Industries,*
   972 F.2d 540 (5th Cir. 1992) ............................................................ 33

*Duferco Steel, Inc. v. United States,*
   29 C.I.T. 1249, 403 F. Supp. 2d 1281 (2005) .................................... 38

*Dynamic 3D Geosolutions LLC v.*
   *Schlumberger Ltd. (Schlumberger N.V.),*
   837 F.3d 1280 (Fed. Cir. 2016) .................................................. 46, 51

*Emle Industries, Inc. v. Patentex, Inc.,*
   478 F.2d 562 (2d Cir. 1973)............................................................. 47

*EZ Paintr Corp. v. Padco, Inc.,*
   746 F.2d 1459 (Fed. Cir. 1984) ............................................ 46, 49, 51

*Firestone Tire & Rubber Co. v. Risjord,*
   449 U.S. 368 (1981) ....................................................... 21, 49, 50, 51

*Foman v. Davis,*
   371 U.S. 178 (1962) ........................................................................ 59

*Ford Motor Co. v. United States,*
   688 F.3d 1319 (Fed. Cir. 2012) ....................................................... 29

*Gibson v. Berryhill,*
   411 U.S. 564 (1973) ........................................................................ 38

*Government of India v. Cook Industries, Inc.,*
   569 F.2d 737 (2d Cir. 1978)............................................................. 47

*Grimes v. District of Columbia,*
   794 F.3d 83 (D.C. Cir. 2015) ........................................................... 34

*Hempstead Video, Inc. v. Village of Valley Stream*,
409 F.3d 127 (2d Cir. 2005) ................................................ 49

*Kearns v. Fred Lavery Porsche Audi Co.*,
745 F.2d 600 (Fed. Cir. 1984) .................................... 46, 51

*Makita Corp. v. United States*,
17 C.I.T. 240, 819 F. Supp. 1099 (1993) ........... 20, 32, 33, 48, 49, 56

*McCarthy v. Madigan*,
503 U.S. 140 (1992) ............................................ 38

*Merle Norman Cosmetics, Inc. v. U.S. District Court*,
856 F.2d 98 (9th Cir. 1988) .............................. 34

*Miller & Co. v. United States*,
824 F.2d 961 (Fed. Cir. 1987) ........................... 19

*Mojave Desert Holdings, LLC v. Crocs, Inc.*,
995 F.3d 969 (Fed. Cir. 2021) ........................... 58

*National Corn Growers Association v. Baker*,
840 F.2d 1547 (Fed. Cir. 1988) ......................... 43

*NEC Corp. v. United States*,
151 F.3d 1361 (Fed. Cir. 1998) ............. 30, 31, 40, 43, 53, 54

*Newman-Green, Inc. v. Alfonzo-Larrain*,
490 U.S. 826 (1989) ........................................ 58

*Nystrom v. TREX Co.*,
339 F.3d 1347 (Fed. Cir. 2003) ......................... 53

*In re Queen's University at Kingston*,
820 F.3d 1287 (Fed. Cir. 2016) ......................... 36

*Richardson-Merrell, Inc. v. Koller*,
472 U.S. 424 (1985) ........................................ 36

*Schlesinger v. Councilman*,
    420 U.S. 738 (1975) ........................................................ 58

*Shakeproof Industrial Products Division of*
    *Illinois Tool Works, Inc. v. United States*,
    104 F.3d 1309 (Fed. Cir. 1997) ..................................... 21, 31, 54, 55

*In re Shared Memory Graphics LLC*,
    659 F.3d 1336 (Fed. Cir. 2011) ................................................. 35, 36

*Shell Oil Co. v. United States*,
    672 F.3d 1283 (Fed. Cir. 2012) ....................................................... 53

*Strausbaugh v. Merit Systems Protection Board*,
    401 F. App'x 524 (Fed. Cir. 2010) ................................................... 53

*Taylor v. Riojas*,
    141 S. Ct. 52 (2020) ........................................................................ 17

*T.C. Theatre Corp. v. Warner Bros. Pictures*,
    113 F. Supp. 265 (S.D.N.Y. 1953) ................................................. 49

*Trone v. Smith*,
    621 F.2d 994 (9th Cir. 1980) ............................................... 46, 48, 56

*Unified Sewerage Agency of Washington County v. Jelco Inc.*,
    646 F.2d 1339 (9th Cir. 1981) ........................................................ 34

*United States v. Prevezon Holdings Ltd.*,
    839 F.3d 227 (2d Cir. 2016)..................................... 36, 37, 48, 49, 52

*In re University of South Florida Board of Trustees*,
    455 F. App'x 988 (Fed. Cir. 2012) ................................. 33, 35, 36, 54

*Van Buskirk v. United Group of Cos.*,
    935 F.3d 49 (2d Cir. 2019).............................................................. 58

*Vette v. K-9 Unit Deputy Sanders,*
   989 F.3d 1154 (10th Cir. 2021) ....................................... 17

*Willingham v. Morgan,*
   395 U.S. 402 (1969) ........................................................ 58

*Yablonski v. United Mine Workers of America,*
   454 F.2d 1036 (D.C. Cir. 1971) ...................................... 33

## Statutes and Rules

19 U.S.C. § 1516a ................................................................ 41

28 U.S.C. § 1295 ............................................................ 1, 53

28 U.S.C. § 1581 ...................................................... *passim*

28 U.S.C. § 1653 ................................................................ 57

28 U.S.C. § 2640 ................................................................ 41

C.I.T. R. 15 ........................................................................ 59

D.C. R. Prof'l Conduct 1.9 ................................................ 45

ABA Model R. Prof'l Conduct 1.9 .................................... 45

## Miscellaneous

H.R. Rep. No. 96-1235 (1980) ...................................... 42, 43

D.C. Office of Disciplinary Counsel,
   *FAQs: What are things Disciplinary Counsel cannot do,*
   *at* https://www.dcbar.org/About/FAQs?id=4970 .............. 39

Keith Swisher,
   *The Practice and Theory of Lawyer Disqualification,*
   27 Geo. J. Legal Ethics 71 (2014) .................................. 40

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, no appeal in or from the same civil action in the lower court was previously before this or any other appellate court. This case is related to another case pending in the Court of International Trade, *Amsted Rail Company, Inc. et al. v. U.S. Department of Commerce et al.*, No. 22-00316 (C.I.T. filed Oct. 31, 2022) (Katzmann, J., presiding).

## STATEMENT OF JURISDICTION

As discussed more fully herein, the Court of International Trade had subject-matter jurisdiction under 28 U.S.C. § 1581(i). The Trade Court's opinion and order dated November 15, 2022 denied a motion for preliminary injunction filed by plaintiffs Amsted Rail Company, Inc. ("ARC"), ASF-K de Mexico S. de R.L. de C.V. ("ASF-K"), Strato, Inc. ("Strato"), and TTX Company ("TTX" and, together with ARC, ASF-K, and Strato, "Plaintiffs"). Appx32-33. The Trade Court entered a judgment dated November 15, 2022. Appx34-35. Plaintiffs filed a timely notice of appeal on December 22, 2022. Appx262-63.[1] This Court has appellate jurisdiction under 28 U.S.C. §§ 1292(a)(1) and (c)(1) and 1295(a)(5).

## STATEMENT OF THE ISSUES

1.  Where a trade agency asserts that, in antidumping and countervailing duty investigations, it will not adjudicate alleged violations of state ethics rules pertaining to an attorney's conflicted legal representation, does the Court of International Trade have subject-matter jurisdiction under 28 U.S.C. § 1581(i) to enjoin the agency from allowing the conflicted attorney to participate in the investigations?

---

[1] A fourth plaintiff, Wabtec Corporation ("Wabtec"), did not appeal.

1

2.    Where a verified complaint's factual allegations are deemed insufficient to establish subject-matter jurisdiction under 28 U.S.C. § 1581(i), does the Court of International Trade err by dismissing the complaint without leave to amend to add the requisite allegations when there is no indication that the plaintiff is unwilling or unable to amend?

## PRELIMINARY STATEMENT

This case presents an important issue not yet decided by this Court: Whether the Court of International Trade has subject-matter jurisdiction under 28 U.S.C. § 1581(i) to disqualify an attorney who formerly represented a client in an earlier set of trade investigations from providing legal representation adverse to the former client in a later set of substantially related trade investigations. Below, the Trade Court ruled that § 1581(i) jurisdiction *could* exist if the conflicted attorney is aware of specific categories of information relevant to the current investigations' defense, and if that information extends beyond what would have been revealed under the predecessor investigations' administrative protective order. The Trade Court nonetheless ruled that jurisdiction did not exist in this case because Plaintiffs had not identified specific shared client confidences in their verified complaint or how the

former attorney might use those confidences against them in the current investigations. On this basis, the Trade Court dismissed Plaintiffs' complaint seeking disqualification for lack of subject-matter jurisdiction. It entered a judgment immediately thereafter.

Plaintiffs had originally moved before the U.S. International Trade Commission ("Commission") to disqualify an attorney, Daniel Pickard, from representing the petitioning party, the Coalition of Freight Rail Couplers ("Coalition"), in ongoing antidumping and countervailing duty investigations that commenced in September 2022. Pickard formerly represented one of the Plaintiffs, ARC, in antidumping and countervailing duty investigations that concluded in July 2022 with a negative injury determination. ARC is a former Coalition member.

Both the current investigations' and predecessor investigations' scopes involve FRC products and the same interested parties, markets, fora, laws, and overlapping periods of investigation. Pickard now represents the Coalition *against* ARC's interests. As the importer of record, ARC will be financially responsible for whatever trade relief may be imposed as a result of any final affirmative determinations.

Pickard's blatant conflict of interest notwithstanding, the Commission refused to adjudicate Plaintiffs' disqualification motion. The Commission asserted that it will not involve itself in attorney conflicts of interest, however egregious, even if they threaten to taint the agency's proceedings. Plaintiffs were left to sue in the Trade Court, seeking a preliminary injunction prohibiting Pickard and his law firm, Buchanan Ingersoll & Rooney PC ("Buchanan"), from further participation in the current investigations. Plaintiffs invoked jurisdiction under 28 U.S.C. § 1581(i), which is available when jurisdiction under another subsection of § 1581 would be "manifestly inadequate." The Trade Court dismissed for lack of jurisdiction, without leave to amend, ruling that jurisdiction was available under 28 U.S.C. § 1581(c), not § 1581(i). Plaintiffs could revive their disqualification claim under § 1581(c), the Trade Court reasoned, *after* the agency issues final affirmative determinations.

Dismissal was erroneous for two principal reasons. *First*, § 1581(i) jurisdiction lies to disqualify Pickard now because, without interlocutory judicial intervention, Plaintiffs will suffer irreparable harms for which a post-determination remedy is manifestly inadequate. Pickard's continued participation in the investigations is bringing about the very

4

evil the rule against his participation is designed to prevent. A subsequent reversal based on such participation cannot undo the damage that will have been done—any agency determination will have been made on a record developed through the fruits of Pickard's unethical labor. In addition, the Trade Court lacks statutory authority in the context of a § 1581(c) appeal to vacate an agency's affirmative determinations because of an attorney's conflicted representation and to re-commence trade investigations *de novo*.

To invoke § 1581(i) jurisdiction, moreover, it was unnecessary for Plaintiffs to identify specific client confidences. The Trade Court imposed an unworkable jurisdictional standard—one at odds with the standard for actually proving disqualification claims. A former client is not required to reveal the confidential information learned by its former attorney to establish a substantial risk that the attorney has confidential information to use in the subsequent matter. The reason for this curb is obvious—to require a client to reveal its shared confidences requires the very disclosure the conflict rules are intended to protect against.

*Second*, the Trade Court dismissed without leave to replead. It offered no reason why Plaintiffs could not amend their verified complaint

to satisfy the newly-minted jurisdictional standard, stating only that Plaintiffs had not done so. Plaintiffs, however, had never suggested they were unable to specify which client confidences the Coalition might use against them. Plaintiffs had argued only that requiring them do so would aggravate the very harms they seek to avoid. In fact, in a related case against the U.S. Department of Commerce ("Department"), ARC and ASF-K amended their verified complaint to add the sort of allegations the Trade Court felt were missing in this case. The Trade Court's outright dismissal and immediate entry of judgment, therefore, was not a valid exercise of discretion. It was an abuse of discretion.

Accordingly, the Court should expedite this appeal, reverse the Trade Court's judgment, and remand the case for further proceedings.

## STATEMENT OF THE CASE

## I.    The Commission's Trade Investigations.

### A.    The Predecessor Investigations.

ARC is a producer of, among other things, freight rail coupler systems and components thereof ("FRCs"). Appx61 ¶ 9. On June 17, 2021, ARC engaged the law firm of Wiley Rein LLP ("Wiley") "to provide legal services in connection with advice regarding the elevation and potential

6

prosecution of antidumping of imports of certain couplings and related rail products." Appx62 ¶ 20. ARC and Wiley formalized this engagement in a letter expressly naming ARC as the client. Appx62 ¶ 21. Daniel Pickard, then a Wiley partner, executed the engagement letter on that firm's behalf. Appx62 ¶ 22. The engagement letter stated that the scope of the representation included "any antidumping and/or countervailing duty proceeding filed on behalf of the domestic manufacturing industry." Appx62-63 ¶ 23.

On September 29, 2021, the Coalition, which at that time included ARC, filed through Pickard a petition with the Commission and the Department. This commenced *Certain Freight Rail Coupler Systems and Components from China*, USITC Inv. Nos. 701-TA-670 and 731-TA-1570 ("Predecessor Investigations"). Appx64 ¶¶ 25-26. As discussed more fully below, the Predecessor Investigations were the forerunner of later, substantially related trade investigations, *Certain Freight Rail Couplers and Parts Thereof from China and Mexico*, USITC Inv. Nos. 701-TA-682 and 731-TA-1592-1593 ("Current Investigations").

The Coalition's petition in the Predecessor Investigations principally alleged that certain FRCs imported from China were being

7

subsidized by the Government of China within the meaning of section 701 of the Tariff Act of 1930, codified as amended at 19 U.S.C. § 1671 ("Tariff Act"), and were being or were likely to be sold at less than normal value within the meaning of section 731 of the Tariff Act, codified as amended at 19 U.S.C. § 1673, and that these unfairly traded imports materially injured the domestic industry producing FRCs. Appx64 ¶ 27. The period of investigation at the Commission was 2019 through 2021, with the record remaining open until June 8, 2022. Appx64 ¶ 28.

On October 6, 2021, ARC, again through Pickard, filed a letter in the Predecessor Investigations withdrawing from the petition. Appx64 ¶ 29. The letter explained that ARC would no longer participate as a petitioning party and that a union would replace ARC as a member of the Coalition. *Id.* On October 14, 2021, ARC's current counsel, the law firm of Faegre Drinker Biddle & Reath LLP ("Faegre"), entered an appearance in the Predecessor Investigations. Appx65 ¶ 30.

Until its withdrawal, ARC supervised and materially contributed to Pickard's preparation for the Predecessor Investigations. Appx65 ¶ 31. ARC confided in Pickard its legal strategy for prosecuting FRC-related trade investigations, competitive decision-making processes, and

extensive FRC-related business proprietary information ("BPI") relevant to establishing the scope of domestic like product, the domestic industry, and the conditions of competition. Appx65 ¶ 32. ARC disclosed this confidential information in the reasonable expectation and belief that Pickard would preserve it within the confines of the attorney-client relationship. Appx65 ¶¶ 33, 34.

Even after Faegre entered its appearance for ARC, Pickard attempted to coach ARC into taking positions he would later use against ARC in the Current Investigations. Appx65 ¶ 35. For instance, in March 2022, he told ARC it would be "very helpful" if ARC took the position, "to the extent that it is factually correct," that "a significant part of the decision to move production to Mexico was due to competition with low priced imports from China." *Id.*

On March 1, 2022, Pickard amended his entry of appearance on the Coalition's behalf to reflect that he had changed law firms. Appx66 ¶ 39. Pickard's amended entry of appearance advised that he is now a shareholder in a new firm, Buchanan, and no longer with Wiley. *Id.*

The Commission conducted its hearing for the Predecessor Investigations on May 12, 2022. Appx66 ¶ 42. Representatives for the

9

Coalition appeared at the hearing accompanied by counsel and submitted pre-hearing and post-hearing briefs, and final comments. *Id.* Three respondent entities—Strato, TTX, and Wabtec—participated in the final phase. *Id.* The Commission announced its unanimous negative vote on June 14, 2022, thus terminating the Predecessor Investigations and denying the Coalition its requested trade relief. Appx66 ¶ 43.

In early July 2022, the Commission issued its determinations and released its final report. Appx67 ¶ 44. Based on the record in the Predecessor Investigations' final phase, the Commission determined that an industry in the U.S. was not materially injured or threatened with material injury by reason of FRC imports found by the Department to be sold in the U.S. at less than fair value and subsidized by China. Appx67 ¶ 45. One reason for the negative injury determination was that Chinese FRCs could not be considered a cause of the alleged injury because of significant non-subject FRC imports from Mexico. Appx67 ¶ 46.

The Commission had issued an administrative protective order in the Predecessor Investigations on October 12, 2021 ("Predecessor APO"). Appx65 ¶ 37. Until July 2022, the Predecessor APO covered only Pickard and two non-attorneys. Appx67 ¶ 47. On July 18, 2022, however, after

10

the Commission issued its determinations concluding the Predecessor Investigations, Buchanan filed an amendment to the Predecessor APO adding numerous attorney and non-attorney applicants. Appx67 ¶ 48. Two months later, on September 26, 2022, Buchanan certified its destruction of Predecessor APO-covered materials. Appx67 ¶ 49.

### B.    The Current Investigations.

Just two days later, on September 28, 2022, the Coalition filed a new petition commencing the Current Investigations. Appx67-68 ¶ 50. The Current Investigations reprise the Predecessor Investigations. *Id.* Both sets of investigations are quasi-adjudicative antidumping and countervailing duty investigations before the Commission pursuant to the same body of statutory and regulatory provisions. *Id.* The petitioning party in each investigation was the Coalition, of which ARC is a former member. *Id.* The FRCs covered by the investigations include E, F, and E/F couplers and E and F knuckles. *Id.* ARC's BPI concerning its FRCs was used in the Predecessor Investigations; much of that same BPI will be the focus of the Current Investigations. *Id.* The petitions in both allege that FRCs are being or are likely to be sold at less than normal value within the meaning of section 731 of the Tariff Act. *Id.*

In the Predecessor Investigations, the period of investigation was 2019 through 2021, with the record remaining open until June 8, 2022. *Id.* In the Current Investigations, the period of investigation is the full years of 2019 through 2021 plus the first half of 2022. *Id.*

On September 29, 2022, Buchanan filed with the Commission an APO application in the Current Investigations ("Current APO") covering the same set of attorneys and non-attorneys covered under the Predecessor APO. Appx68 ¶ 51.

The Coalition hopes to "fix" the negative injury determination in the Predecessor Investigations by adding imports from Mexico to the Current Investigations' scope. Appx69 ¶ 58. To do this, the Coalition paints a target on ARC. ARC, the Coalition's new petition asserts, "which was formerly a major producer of FRCs in the United States, relocated substantially all of its FRC production to Mexico and is now an importer of in-scope FRCs that are produced at its Mexican location." Appx69 ¶ 59. "The AAR certified manufacturing plant in Mexico that manufactures FRC products is ASF-K de Mexico, S. de R. L. de C.V. Sahagun, which is owned by ASF-Keystone, a division of ARC Industries' ARC Rail Group."

*Id.* This is the same scenario that existed during the Predecessor Investigations, yet the Coalition did not include Mexican imports. *Id.*

In the new petition's telling, the "shift to production in Mexico by [ARC] has resulted in a significant market share decrease for domestic producers that chose not to abandon their U.S. employees and to continue their FRC production in the United States." Appx69 ¶ 60. ARC "relocated its production to Mexico," the petition posits, "to offer prices in the U.S. market for its imported FRCs from Mexico that are competitive with Chinese FRCs." Appx69 ¶ 61.

Immediately upon learning of Pickard's participation in the Current Investigations as the Coalition's lead counsel, ARC moved to protect itself from the betrayal. Appx69 ¶ 62. It directed Faegre to send a letter to Pickard detailing his ethical violation and requesting Buchanan's withdrawal from further representation of the Coalition in the Current Investigations. *Id.* Faegre sent a letter to that effect on October 6, 2022. *Id.* Buchanan's general counsel sent a letter rejecting the request on October 11, 2022. Appx69-70 ¶ 63.

On October 11 and 13, 2022, ARC and ASF-K filed letters with the Commission asking it to: (i) disqualify Buchanan from further

participation as counsel for the Coalition in the Current Investigations; (ii) rescind Buchanan's authorization to receive BPI under the Current APO; and (iii) require neither ARC nor ASF-K to serve BPI questionnaire responses on Buchanan until the Commission determines whether Buchanan should be disqualified from practicing in the Current Investigations and/or excluded from the Current APO. Appx70 ¶ 64.

One basis for these requests was Pickard's violation of Rule 1.9(a) of the American Bar Association's ("ABA") Model Rules of Professional Conduct and its analog, Rule 1.9 of the District of Columbia Rules of Professional Conduct. Appx70 ¶ 65. Both state that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in … a substantially related matter in which that person's interests are materially adverse to the interests of the former client." Pickard violated Rule 1.9 because ARC is Pickard's former client in connection with the Predecessor Investigations; ARC is materially adverse to the Coalition in the Current Investigations; the Predecessor Investigations are substantially related to the Current Investigations; and ARC did not consent to Pickard's representation in the Current

14

Investigations. The conflict, moreover, is imputed to Buchanan at large under Rule 1.10 of the ABA Model Rules and the D.C. Rules.

Another basis for the requests was Buchanan's potential violation of the Predecessor APO. Appx71 ¶ 68. By its terms, the Predecessor APO requires authorized applicants to use BPI "solely for the purposes of the above-captioned Commission investigation or for U.S. judicial review or review pursuant to the North American Free Trade Agreement the determination resulting from such investigation of such Commission investigation." Appx71 ¶ 70. On information and belief, Buchanan abused the Predecessor APO by using ARC's and others' BPI as a springboard for the Current Investigations. Appx71-72 ¶ 71. Buchanan added numerous attorneys and non-attorneys to the Predecessor APO *after* the Commission had already issued its determinations in the Predecessor Investigations. *Id.* On information and belief, Buchanan's post-determination use of the BPI advanced the Current Investigations, not the Predecessor Investigations. Appx72 ¶ 72. In letters to the Commission, therefore, Plaintiffs urged the Commission to investigate this potential APO violation. Appx72 ¶¶ 72, 73.

On October 13, 2022, the Commission's Acting Secretary, Katherine Hiner, announced that the Commission had decided to release Plaintiffs' BPI to Buchanan before the preliminary staff conference, which was then scheduled to occur on October 19, 2022. Appx72 ¶ 74.

## II.   Litigation In The Trade Court.

### A.   Litigation With The Commission.

Plaintiffs filed suit in the Trade Court and moved for a temporary restraining order on October 14, 2022. Appx72 ¶ 75; Appx51. Plaintiffs' sought an injunction preventing the Commission from disclosing BPI to Buchanan. Appx51.

The Trade Court issued a temporary restraining order on October 18, 2022. Appx51-52. Among other things, the order temporarily restrained the Commission from disclosing, or requiring disclosure of, BPI submitted in the Current Investigations. Appx51. The Trade Court determined that: (i) irreparable harm would be incurred; (ii) there was a likelihood of success on the merits; (iii) the balance of hardships favored the imposition of the temporary restraining order; and (iv) the temporary restraining order was in the public interest. *Id.*

On October 21, 2022, Acting Secretary Hiner rejected Plaintiffs'
request to investigate serious allegations of an APO breach because, in
her view, the evidence was "insufficient to warrant institution of an APO
breach at this time." Appx73 ¶ 80; Appx10-11. That same day, Acting
Secretary Hiner also rejected ARC's request to disqualify Buchanan,
tersely stating that there was "not good cause at this time to disqualify"
because the Commission "does not adjudicate" violations of the ABA
Model or D.C. Rules of Professional Conduct. Appx73-74 ¶ 81; Appx11.

On October 24, 2022, Plaintiffs filed a verified[2] amended complaint
or, in the alternative, petition for writ of mandamus. Appx58-87.
Invoking 28 U.S.C. § 1581(i) as its jurisdictional authority, Appx59 ¶ 1,
this complaint asserted four counts. Appx74-83 ¶¶ 82-124.

Count I alleged that the Commission's refusal to disqualify was
arbitrary and capricious in violation of the Administrative Procedure Act
("APA"), 5 U.S.C. § 551 *et seq.* Appx74-79 ¶¶ 82-99. Count II alleged the
Commission's decision that it was prepared to release Plaintiffs' BPI to
Buchanan without investigating the potential APO violation or ethical

---

[2] Verified pleadings are competent evidence, *see Taylor v. Riojas*, 141 S.
Ct. 52, 53 n.1 (2020), and equivalent to affidavits and declarations. *See
Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1163 (10th Cir. 2021).

conflict was arbitrary and capricious. Appx79-81 ¶¶ 100-08. Count III alleged the decision to disclose Plaintiffs' BPI without affording them a meaningful opportunity to be heard violated Plaintiffs' constitutional due process rights. Appx81-82 ¶¶ 109-18. Count IV alleged that, if APA review is unavailable, the Commission was subject to a writ of mandamus directing it to disqualify Buchanan. Appx82-83 ¶¶ 119-24. The verified amended complaint asked the Trade Court to direct the Commission to disqualify Buchanan, prohibit the Commission from disclosing Plaintiffs' BPI to Buchanan or requiring Plaintiffs to do so, and dismiss the petition in the Current Investigations. Appx83-84.[3]

The Commission and Coalition each moved to dismiss for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted. Appx11-12. The Court converted Plaintiffs' motion for a temporary restraining order (relating to the BPI release) into one for a preliminary injunction. Appx10. Plaintiffs also filed a second motion for preliminary injunction seeking Buchanan's disqualification. Appx11 n.9. Each side opposed the other side's motions. Appx11-12.

---

[3] To be clear, Counts II and III, which concern the release of Plaintiffs' BPI, *are not* at issue in this appeal. Counts I and IV, Plaintiffs' disqualification claims, *are* at issue.

18

On October 27, 2022, the Court extended the temporary restraining order until November 15, 2022. Appx88-89. It held a hearing on the various motions on November 9, 2022. Appx12.

In its November 15, 2022 opinion and order,[4] the Trade Court dismissed the verified amended complaint without prejudice to refiling under 28 U.S.C. § 1581(c), which can only occur after the Commission issues final determinations. Appx5; Appx33. The Trade Court ruled that it lacked subject-matter jurisdiction under § 1581(i) to hear Plaintiffs' claims, including the disqualification claims, and denied Plaintiffs' petition for mandamus. Appx17-33.

Citing *Miller & Co. v. United States*, 824 F.2d 961 (Fed. Cir. 1987), the Trade Court explained that § 1581(i) jurisdiction may not be invoked when jurisdiction under another subsection of § 1581 is available unless the remedy provided under that other subsection would be "manifestly inadequate." Appx17-18. Review is appropriate where the opportunity for full relief would be lost while awaiting the final determination. Appx18. "Determining whether full relief would be lost requires the court not only

---

[4] Published as *Amsted Rail Co. v. U.S. Int'l Trade Comm'n*, ___ F. Supp. 3d ___, No. 22-00307, 2022 WL 16959404 (C.I.T. Nov. 15, 2022).

to compare the remedies available but also to evaluate the nature of the harm in waiting for review to ripen under § 1581(c)." Appx22.

The Trade Court acknowledged *Makita Corp. v. United States*, 17 C.I.T. 240, 819 F. Supp. 1099 (1993), "which allowed § 1581(i) review of an agency decision during the pendency of an investigation to not investigate alleged ethical violations." Appx25. But it distinguished that decision, asserting that "the *Makita* plaintiffs had furnished affidavits and live testimony that detailed the precise nature of the information that the potentially conflicted attorney had acquired." Appx26.

> The plaintiffs' submitted evidence in *Makita* made it abundantly clear that the attorney was aware of specific categories of information relevant to Makita's defense in the antidumping investigations and that those categories of information extended far beyond what Makita would have otherwise revealed under APO. Comparatively, the facts that Plaintiffs offer in the instant case—looking only to the pleaded complaint and filings, as no additional affidavits or testimony is available—fall far short of establishing "sufficient uncertainty" of attorney misconduct that necessitates relief under § 1581(i).

Appx26-27. In short, the Trade Court concluded, "Plaintiffs' allegations of attorney misconduct" were "too threadbare to meet the more specific showing that [sic] manifest inadequacy under § 1581(i)." Appx27.

20

The Trade Court found further support in *Firestone Tire & Rubber Co. v. Risjord*, which "h[e]ld that orders denying motions to disqualify counsel are not appealable final decisions under § 1291," 449 U.S. 368, 370 (1981), Appx27-29, and in *Shakeproof Industrial Products Division of Illinois Tool Works, Inc. v. United States*, which expressed in *dicta* "serious doubts" whether, under that case's unique facts, "judicial review of the disqualification issue would be manifestly inadequate if it were postponed until Commerce's final decision on the first review of the antidumping order." 104 F.3d 1309, 1313 (Fed. Cir. 1997). Appx18-19.

The Trade Court left open the possibility that Plaintiffs could successfully invoke § 1581(i) jurisdiction on expanded facts:

> Today's holding does not foreclose any interlocutory judicial review of APO breach or attorney misconduct allegations. By applying the manifestly inadequate test to determine § 1581(i) jurisdiction on a case by case basis, there may indeed be fact patterns involving APO violations or ethical violations that rise to the level of interlocutory review. We limit today's holding to the facts at bar and conclude that Plaintiffs have not met their burden under *Miller & Co.*

Appx29 n.16; *see also* Appx 46 n.8. The Trade Court nonetheless entered a judgment just minutes after it entered its opinion and order, thereby terminating the case without first granting leave to amend. Appx34-35.

21

The Trade Court also denied the claim for mandamus, stating that "Plaintiffs may adequately obtain relief through a potential suit challenging the Commission's injury determination under § 1581(c) for the reasons" it had already stated. Appx32. It declined to consider whether the other conditions for mandamus had been met, *i.e.*, "whether there is a 'clear and indisputable' right to issuance at stake." *Id.*

Plaintiffs quickly moved for an injunction pending appeal. Appx37. The Commission and Coalition opposed this motion too. The Trade Court denied Plaintiffs' motion in an opinion and order dated December 20, 2022. Appx39.[5] Its finding that "Plaintiffs fail to demonstrate a strong showing of success on the merits" doubled-down on its ruling in the November 15 opinion that "a more specific showing" than "the facts before it" was needed to establish § 1581(i) jurisdiction. Appx44. The Trade Court also found that Plaintiffs failed "to demonstrate irreparable harm absent an injunction pending appeal," Appx47, and "the balance of equities and public interest further weigh in favor of denial." Appx49.

Plaintiffs timely appealed on December 22, 2022. Appx262.

---

[5] Published as *Amsted Rail Co. v. U.S. Int'l Trade Comm'n*, ___ F. Supp. 3d ___, No. 22-00307, 2022 WL 17820551 (C.I.T. Dec. 20, 2022).

## B.    Litigation With The Department.

A related case bears on this one. Two weeks after they sued the Commission, ARC and ASF-K filed a companion suit in the Trade Court against the Department. Appx92-146. That related case, No. 22-00316, remains pending before the same judge. As they do in this case, based on the same conflict of interest, ARC and ASF-K seek to disqualify Pickard and Buchanan from participating in parallel antidumping investigations before the Department. Appx117. Unlike Plaintiffs' verified pleadings in this case, Plaintiffs' verified pleadings in the related case amplified the factual allegations about shared client confidences. Appx99-103 ¶¶ 28-40. These allegations were added in response to the Trade Court's November 15 opinion, to detail the precise nature of the information that Pickard acquired in the course of his earlier legal representation of ARC.[6]

For example, after review of trade data, Pickard contacted ARC for advice regarding the wording of the scope language the petition for the Predecessor Investigations would propose. Appx99-100 ¶ 29. Pickard

---

[6] Plaintiffs submitted the verified complaint from the related case in connection with their post-judgment motion for injunction pending appeal filed in this case. Appx91-146. As explained in Argument Part III, *infra*, this Court may properly consider these additional facts on appeal.

could not reconcile data reflecting China-origin FRC imports. *Id.* The quantities of imports he derived seemed too low. *Id.* Pickard contacted Jay Allan of ARC to seek input concerning the seemingly low values. *Id.*

Divulging "extremely confidential information," Appx101 ¶ 36, Allan explained that the low values were likely due to China-origin FRCs entering Mexico complete or incomplete, and subsequently attached to Mexican-produced rail cars to be imported into the U.S. without reporting of the attached FRCs in data collected by U.S. Customs and Border Protection. *Id.* Allan shared how ARC and its *maquiladora*, ASF-K, do business with original equipment manufacturer customers that produce rail cars in Mexico. *Id.* He explained how ARC itself sells to these customers with rail car production facilities in Mexico and how ARC's own FRCs produced in Mexico are attached to rail cars in Mexico and then exported from Mexico. *Id.* Allan further explained how FRCs attached to rail cars cross from Mexico into the U.S. without the government collecting data on the quantity of FRCs imported. *Id.* Special provisions under U.S. law allow freight cars and certain "Instruments of International Traffic" to be admitted to the U.S. without being declared in a formal customs entry for consumption. *Id.* As a result, substantial

24

quantities of FRCs attached to rail cars are imported that do not appear in government statistics. *Id.*

From these confidences, Pickard understood that he could revise the scope language to cover FRCs joined to non-subject parts in the country of manufacture of the FRCs or a third country, which would cover Chinese-manufactured FRCs attached to rail cars manufactured in Mexico and which cross into the U.S. Appx100 ¶ 30. Although some of these FRCs are sourced from China and then sold to rail car producers in Mexico, a much larger quantity are sourced from ARC's Mexican production facility and sold to the same producers in Mexico. Appx100 ¶ 31. Because the petition in the Predecessor Investigations covered only FRCs from China, not FRCs from Mexico, ARC had no reason to worry that this scope expansion would affect its Mexican operations. *Id.*

Its candor with Pickard would come to haunt ARC. The Current Investigations' scope includes FRCs attached to rail cars in Mexico that are then exported to the United States. Appx101 ¶ 34. This directly affects ARC because substantial quantities of FRCs produced in Mexico are covered by that scope. *Id.* In the Current Investigations, ARC is opposed to the scope of the investigation for its FRCs that are attached

to rail cars in Mexico. Appx101 ¶ 35. Via its *maquiladora*, ARC is the producer and seller of FRCs attached to rail cars in Mexico that are exported to the U.S. *Id.* ARC is thus the entity that will be directly affected if antidumping duties are assessed on the FRCs it produces in Mexico, directly exported to the U.S. or attached to rail cars in Mexico and then exported to the U.S. *Id.*

Nor is that all. Between June 2021 and September 2021, ARC and Pickard worked together extensively to prepare for the Predecessor Investigations. Appx102-03 ¶ 40. They discussed sensitive marketplace conditions and proprietary analysis of ARC's and competitors' products. *Id.* ARC provided key input into the petition that was eventually filed in the Predecessor Investigations. *Id.* Pickard had access to and likely reviewed numerous documents that contained confidential information about Plaintiffs' competition, distribution practices, pricing practices, operations, and sales figures, among other things. *Id.* He became aware of specific categories of information relevant to ARC's and ASF-K's positions in the trade investigations. *Id.* These categories of information extend far beyond what ARC would have otherwise revealed under the Predecessor APO. *Id.*

## SUMMARY OF THE ARGUMENT

### I.

A.    The Trade Court had jurisdiction under 28 U.S.C. § 1581(i) to hear Plaintiffs' claims seeking Buchanan's immediate disqualification. Plaintiffs easily satisfy this Circuit's "manifest inadequacy" test for such jurisdiction. They cannot await the agency's final determinations to seek review under § 1581(c). Plaintiffs' right to proceedings untainted by Pickard's conflict of interest will be destroyed if that right's vindication is postponed until after the Current Investigations have run their course. ARC shared critical client confidences with Pickard, who may misuse or disclose those confidences to the Coalition's unfair advantage in the Current Investigations. For similar reasons, in the analogous context of petitions for writs of mandamus, this Circuit and others have ruled that aggrieved clients have no other means of obtaining the relief desired except through interlocutory judicial review. Because of the substantial overlap between the test for mandamus and the test for § 1581(i) jurisdiction, the rationale of these cases should control here.

B.    Plaintiffs satisfy the "manifest inadequacy" test for another, independent reason: Judicial review of agency decisions involving

27

attorney disqualification is not permitted under § 1581(c). Attorney disqualification simply does not bear on that statute's limited remit, *i.e.*, whether the agency's determinations concerning dumping or countervailable subsidies are "unsupported by substantial evidence" or "otherwise not in accordance with law."

C.    Nor should Plaintiffs have been required to meet the Trade Court's unworkable jurisdictional standard. The Trade Court required Plaintiffs to spell out which of ARC's shared confidences are sensitive and might be exploited, or better exploited, by the Coalition in the Current Investigations. Requiring a showing of actual shared confidences requires the very disclosure the conflict rule protects against. Demanding self-destructive pleading is not the right way to cabin § 1581(i) jurisdiction. As is true of proving entitlement to disqualification on the merits, showing a "substantial relationship" between the two matters should suffice, for jurisdictional purposes, to establish a substantial risk that the lawyer has confidential information to use. The substantial relationship test removes the need for courts to make direct inquiry into whether confidential information was actually transmitted.

28

## II.

At a minimum, the Trade Court should have dismissed with leave to replead the jurisdictional allegations. Even if this Court were to deem Plaintiffs' existing allegations insufficient, the remedy for insufficient specificity, in the ordinary course, would be dismissal with leave to amend, not dismissal immediately followed by a judgment terminating the case. If given the opportunity to do so, Plaintiffs would amend their verified pleadings to meet the Trade Court's overly onerous jurisdictional standard, *i.e.*, by showing that Pickard was aware of specific categories of information relevant to ARC's and others' defenses in the Current Investigations and that those categories of information extend far beyond what ARC would have otherwise revealed under the Predecessor APO.

## ARGUMENT

## I.     Standard Of Review.

"This court reviews the Court of International Trade's dismissal for lack of subject matter jurisdiction *de novo*." *Ford Motor Co. v. United States*, 688 F.3d 1319, 1322 (Fed. Cir. 2012). Where, as here, the underlying motion to dismiss "simply challenges the court's subject matter jurisdiction based on the sufficiency of the pleading's

allegations—that is, the movant presents a 'facial' attack on the pleading—then those allegations are taken as true and construed in a light most favorable to the complainant." *Cedars-Sinai Med. Center v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993).

## II. Jurisdiction Lies Under 28 U.S.C. § 1581(i) Because Plaintiffs' Remedies Under Other Subsections Of § 1581 Are Manifestly Inadequate.

Chapter 95 of Title 28 of the United States Code, entitled "Court of International Trade," contains Congress' jurisdictional grant to the Trade Court. The chapter's first section is § 1581, "Civil actions against the United States and agencies and officers thereof," and consists of subsections (a) through (j). Subsections (a) through (h) assign exclusive jurisdiction to the Trade Court regarding civil actions against the United States in a variety of matters affecting foreign commerce, including the antidumping and countervailing duty laws.

Subsection (i) contains what has been called a "residual provision." *NEC Corp. v. United States*, 151 F.3d 1361, 1368 (Fed. Cir. 1998). It grants to the Trade Court exclusive jurisdiction over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for … administration

and enforcement with respect to," among other things, "revenue from imports or tonnage" and "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." 28 U.S.C. § 1581(i)(1).

Plaintiffs invoke 28 U.S.C. § 1581(i) as the jurisdictional basis for this case. They acknowledge that the "jurisdiction provided by subsection (i)" is "available only when jurisdiction under another subsection of 1581 is either unavailable or, if available, 'manifestly inadequate.'" *NEC*, 151 F.3d at 1368 (citing *Shakeproof*, 104 F.3d at 1312). Plaintiffs dispute, however, the Trade Court's ruling that Plaintiffs have an adequate remedy if they seek post-determination judicial review under § 1581(c), rather than interlocutory judicial review under § 1581(i).

**A.   In A Trade Investigation, The Harms A Former Client Faces From A Conflicted Legal Representation Cannot Be Remedied By *Ex Post Facto* Review Under § 1581(c).**

**1.   This Court and others recognize the inadequacy of awaiting adjudications on the merits before deciding disqualification motions.**

This Court has never decided whether § 1581(i) jurisdiction lies to judicially review, during the pendency of an ongoing trade investigation, an agency decision to not investigate alleged attorney ethical violations.

31

Other than the contested decision below, Plaintiffs are aware of only a single Trade Court decision addressing that question: *Makita Corp. v. United States*, 17 C.I.T. 240, 819 F. Supp. 1099 (1993).

In *Makita*, as here, the trade agency refused to adjudicate a motion to disqualify interested parties' former counsel from further participation in an ongoing antidumping investigation, even though the attorney had represented his former clients in a substantially related investigation. 819 F. Supp. at 1102-03. Asserting a conflict of interest under the same Rule of Professional Conduct Plaintiffs assert here (Rule 1.9), the former clients sought preliminary and permanent injunctive relief in the Trade Court disqualifying their former counsel. Citing § 1581(i), the *Makita* court found that "[t]his is a forum which has jurisdiction over such matters." 819 F. Supp. at 1103-04 & n.6.

That jurisdictional finding was consonant with the *Makita* court's further decision to preliminarily enjoin the conflicted attorney from participating in the antidumping investigation. The former clients claimed "fear of unfair advantage if their adversary" is "at liberty to avail itself of [the attorney's] accumulated knowledge." *Id.* at 1108. That harm could not be remedied by waiting until the agency's final determinations:

> Whatever has already happened independent of these proceedings, this case requires the court to look to the present and the future, and, from this perspective, it cannot be said with certainty that any taking of unfair advantage could be remedied *ex post facto*. Ergo, the plaintiffs are confronted with the threat of irreparable harm.

*Id.* at 1108.

Both the findings of § 1581(i) jurisdiction and irreparable harm in *Makita* make eminent sense. "'Continued participation as an attorney, by one who is disqualified by conflict of interest from so doing, will bring about the very evil which the rule against his participation is designed to prevent, and a subsequent reversal based upon such participation cannot undo the damage that will have been done as a result of such participation.'" *Yablonski v. United Mine Workers of Am.*, 454 F.2d 1036, 1039 (D.C. Cir. 1971) (quoting *Cord v. Smith*, 338 F.2d 516, 521-22 (9th Cir. 1959)). This principle has been echoed in many federal appellate decisions, including from this Court. *See, e.g.*, *In re Univ. of S. Fla. Bd. of Trs.*, 455 F. App'x 988, 991 & n.1 (Fed. Cir. 2012); *In re Am. Airlines, Inc.*, 972 F.2d 605, 608-09 (5th Cir. 1992) ("immediate review of [movant's] motion to disqualify is appropriate because it will otherwise suffer 'irreparable harm'"); *In re Dresser Indus.*, 972 F.2d 540, 543 (5th Cir.

1992); *Merle Norman Cosmetics, Inc. v. U.S. Dist. Ct.*, 856 F.2d 98, 101 (9th Cir. 1988) (in interlocutory challenge to order denying attorney disqualification, "if petitioners' claims were wellfounded, the damage would be irremediable"); *Unified Sewerage Agency of Washington County v. Jelco Inc.*, 646 F.2d 1339, 1344 (9th Cir. 1981) (in interlocutory challenge to order denying attorney disqualification, wronged clients "could suffer irremediable damage if forced to wait until after trial to appeal" because "[a]ny advantage [former counsel] possesses as a result of its representation of [the clients] could be put to use at trial").

Federal courts require attorney disqualification motions to be decided before substantive decisions are rendered because "'the success of a disqualification motion has the potential to change the proceedings entirely.'" *Grimes v. District of Columbia*, 794 F.3d 83, 90 (D.C. Cir. 2015) (quoting *Bowers v. Ophthalmology Group*, 733 F.3d 647, 654 (6th Cir. 2013)). "Resolving asserted conflicts before deciding substantive motions assures that no conflict taints the proceeding, impairs the public's confidence, or infects any substantive motion prepared by or under the auspices of conflicted counsel." *Id.*

Federal Circuit precedent amply supports these principles. In *In re University of South Florida Board of Trustees*, a client petitioning for a writ of mandamus was unable to establish "a clear and indisputable right to have [a law firm] disqualified as counsel," so the petition was denied. 455 F. App'x at 991-92. In doing so, however, the Federal Circuit explicitly rejected the respondent's contention "that the petition must be denied because [the petitioning client] has other means of obtaining the relief desired." *Id.* at 991 n.1 (citing *In re Shared Memory Graphics LLC*, 659 F.3d 1336, 1340 (Fed. Cir. 2011)). "Orders involving the disqualification of counsel can be remedied through a writ of mandamus." *Id.* One prerequisite of mandamus relief is the manifest inadequacy of remedies other than immediate interlocutory judicial review; "a party seeking a writ bears the burden of proving that it has no other means of obtaining the relief desired." *Id.* at 991.

Likewise, in *Shared Memory*, the Federal Circuit had no difficulty concluding that an order *granting* an attorney disqualification motion warrants mandamus relief. 659 F.3d at 1340. "By the time an appeal … could be taken, the [proceedings] would be over, and [the disqualified attorney's client] would have gone through the [proceedings] without the

35

counsel of its choice." *Id.* This was true even though the client might eventually prevail on the merits. And it was true even though, in *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424 (1985), the Supreme Court had held that interlocutory appeals do not lie from orders granting attorney disqualification. *See Shared Memory*, 659 F.3d at 1340 ("Far from stating that an order disqualifying counsel may not be remedied through a writ of mandamus," the Supreme Court affirmed that remedy's availability); *cf. In re Queen's Univ. at Kingston*, 820 F.3d 1287, 1294 (Fed. Cir. 2016) (mandamus necessary to decide patent-agent privilege's existence because, otherwise, "the confidentiality of the documents as to which such privilege is asserted would be lost").

This case and *University of South Florida* are just the flip side of the *Shared Memory* coin. Orders granting disqualification motions are akin to orders denying disqualification motions. *See Univ. of S. Fla.*, 455 F. App'x at 991 & n.1 (citing *Shared Memory*, addressing orders "involving" disqualification). The irremediable harm suffered by a client deprived of its choice of counsel corresponds to the irremediable harm a former client suffers by its former counsel's conflicted representation. Either way, the harm cannot be meaningfully undone after the

proceedings conclude. If anything, the harm from an order wrongfully granting disqualification is easier to undo. The proceedings can be re-commenced *de novo* with the counsel's participation. The harm from an order wrongfully denying disqualification, however, will have irreparably altered the course of the proceedings, the litigation strategy, and the evidentiary record, so re-commencing the proceedings without the conflicted representation will not cure the taint.

This is especially true here because, following final determinations, it is unclear what exactly could be done *ex post facto* to expunge the Coalition's unfair advantage from Pickard's conflicted representation. Would the Department's antidumping investigations be re-commenced from scratch, albeit without Buchanan's participation? Does the Trade Court even possess the statutory authority to order that remedy? How would the Commission purge itself of the ill-gotten information obtained from Pickard's submissions? Neither the Commission, the Coalition, nor the Trade Court explain how any of this would be possible.

The Trade Court waved away the mandamus cases as irrelevant to the § 1581(i) framework. Appx46-47 n.9. But "the substantial overlap between the test for mandamus and the test for residual jurisdiction

under 28 U.S.C. § 1581(i)," *Duferco Steel, Inc. v. United States*, 29 C.I.T. 1249, 403 F. Supp. 2d 1281, 1282 n.1 (2005), is undeniable. And even if the mandamus cases were irrelevant to § 1581(i) jurisdiction, they at least show that Plaintiffs lack an adequate alternative remedy for mandamus purposes. Thus, at a minimum, this Court should reverse the Trade Court's contrary holding and remand for it to consider whether Plaintiffs have satisfied the other prerequisite for mandamus relief.

Concerns about unfair advantage in agency proceedings are especially salient where, as here, the agency expressly abjures its ability or willingness to address a conflicted representation in any remand, present or future. Appx54-55. An "administrative remedy may be inadequate 'because of some doubt as to whether the agency was empowered to grant effective relief.'" *McCarthy v. Madigan*, 503 U.S. 140, 147 (1992) (quoting *Gibson v. Berryhill*, 411 U.S. 564, 575 n.14 (1973)). "For example, an agency, as a preliminary matter, may be unable to consider whether to grant relief because it lacks institutional competence to resolve the particular type of issue presented," *id.* at 147-48, which is the very circumstance the Commission asserts here. Appx54-55.

The Commission and Coalition hold the view that Plaintiffs would have an adequate remedy if they simply reported Pickard to the District of Columbia Office of Disciplinary Counsel. That view is unsound. Because the Commission refuses to intervene, the judiciary is Plaintiffs' *only* line of defense against the ongoing conflict of interest. Only a court can disqualify Pickard and Buchanan. "Disciplinary Counsel cannot" "[s]top other legal proceedings" or "[f]orce an attorney to do something." D.C. Office of Disciplinary Counsel, *FAQs: What are things Disciplinary Counsel cannot do*, *at* https://www.dcbar.org/About/FAQs?id=4970.

A discipline-only approach leaves Plaintiffs without a real remedy:

> Perhaps most importantly, discipline on the merits pales in comparison to the disqualification remedy; discipline will not cure the violation in the same way that disqualification could. Disqualification stops (*i.e.*, enjoins) the conflict. Discipline, however, effectively permits the conflict to continue for months or years as the disciplinary investigation ensues (assuming it ensues), and even after the investigation and potential subsequent prosecution conclude, discipline (or a malpractice action) almost never involves an injunction against a specific representation. To be sure, if the disciplinary sanction is disbarment or suspension, all representations are effectively enjoined. Such a substantial sanction for first-time (or even second-time) conflicts of interest is rare, however. When other, more common sanctions are imposed (*e.g.*,

> reprimand, admonishment, or censure), this "remedy" is not much of a remedy for continuing-violation cases; it does not retroactively protect the confidential information or restore the lawyer's loyalty to the client, for example.

Keith Swisher, *The Practice and Theory of Lawyer Disqualification*, 27 Geo. J. Legal Ethics 71, 115 (2014). "To a very large extent, unless a conflict is addressed by courts upon a motion for disqualification, it may not be addressed at all." *Am. Airlines*, 972 F.2d at 611. For this reason, it is "not clear that the vitality of state enforcement is relevant to the judicial duty of the federal courts to clean its own house." *Id.*

### 2.    Subsection 1581(c) does not allow judicial review of agency decisions on attorney disqualification.

Plaintiffs agree with the Trade Court that "[d]etermining whether full relief would be lost requires the Court not only" to "evaluate the nature of the harm in waiting for review to ripe under § 1581(c)," but also "to compare the remedies available." Appx22. Not only is there genuine "harm in waiting," § 1581(c) does not permit judicial review of agency decisions regarding attorney disqualification. Consequently, filing an action under § 1581(c) does not afford an "available" remedy. Not all types of judicial review fit into that subsection. *See NEC*, 151 F.3d at 1368-69 (administrative prejudgment claims are not reviewable under § 1581(c)).

Under § 1581(c), the Trade Court has jurisdiction, in relevant part, over "any civil action commenced under section 516A of the Tariff Act of 1930." Section 516A(a), in turn, concerns (for present purposes) appeals from a trade agency's "[f]inal affirmative determinations" under the dumping and countervailable subsidy laws. 19 U.S.C. § 1516a(a)(2)(B)(i). Plaintiffs' disqualification claims concern "the administration and enforcement" of such laws, 28 U.S.C. § 1581(i)(1)(D), and do not concern one of the dumping or countervailable subsidiary determinations contemplated in § 516A(a). The claims, therefore, falls outside the ambit of § 1581(c), and fall squarely within the ambit of § 1581(i).

The relevant standard of review proves the point. The standard in an action predicated on § 1581(c) jurisdiction is whether the final determinations are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Id.* § 1516a(b)(2)(B)(i); *see also* 28 U.S.C. § 2640(b). An agency's decision to refuse to adjudicate a motion for attorney disqualification does not bear in the slightest on whether the agency's eventual dumping or countervailable subsidy determination is "unsupported by substantial evidence" or is "not in accordance with law." It is a decision wholly collateral to such a determination.

41

The legislative history of § 1581 further proves the point. Congress made clear that, by virtue of the "administration and enforcement" language in § 1581(i), the Trade Court has jurisdiction over "a civil action relating to an antidumping or countervailing duty proceeding so long as the action does not involve a challenge to a determination specified in section 516A." H.R. Rep. No. 96-1235, at 47-48 (1980). Congress thus distinguished between civil actions involving the direct review of the determinations listed in § 1516a, over which the Trade Court has jurisdiction under § 1581(c) exclusively, and claims relating to the "administration and enforcement" of the antidumping and countervailing duty laws, which the Trade Court can review under § 1581(i).

The Trade Court nonetheless suggested that Plaintiffs' claim can be characterized as an attack on the "procedural correctness" of a § 1516a determination. Appx19. But Congress meant to limit § 1581(c) review to decisions bearing directly on the outcome of a § 1516a determination. "For example, a preliminary affirmative antidumping or countervailing duty determination or a decision to exclude a particular exporter from an antidumping investigation would be reviewable, if at all, only in connection with the review of the final determination by the

administering authority or the ITC." H.R. Rep. No. 96-1235, at 48. The Trade Court's contrary ruling swallows § 1581(i) whole because the "procedural correctness" of *any* agency decision in a trade investigation can be related in *some* way to a final determination.

Plaintiffs do not challenge the Commission's decision to conduct an investigation, its preliminary determination, or any other substantive decision in the Current Investigations. Plaintiffs challenge only the Coalition's counsel's participation in the investigations. Because this does not involve a determination reviewable under § 1516a, it is the type of claim over which Congress granted § 1581(i) jurisdiction. "This is not a case in which [Plaintiffs are] attempting to 'sail past carefully constructed limitations simply by invoking other and more general legislation.'" *NEC*, 151 F.3d at 1369 (quoting *Nat'l Corn Growers Ass'n v. Baker*, 840 F.2d 1547, 1558 (Fed. Cir. 1988)).

### B. To Invoke Jurisdiction, Former Clients Should Not Be Put To The Self-Destructive Burden Of Revealing Which Confidences Could Be Used To Harm Them.

The Trade Court did not doubt that there could be "fact patterns" involving "ethical violations that rise to the level of interlocutory review" and, on that basis, limited its holding "to the facts at bar." Appx29 n.16.

In doing so, the Trade Court put ARC to the burden of revealing the client confidences ARC shared with Pickard, and how those confidences might be relevant in the Current Investigations. It reasoned that "Plaintiffs' allegations of attorney misconduct" are "too threadbare to meet the more specific showing that [sic] manifest inadequacy under § 1581(i)." Appx27. It faulted Plaintiffs for not "furnish[ing] affidavits and live testimony that detailed the precise nature of the information that the potentially conflicted attorney had acquired." Appx26. On this basis, the Trade Court concluded that, unlike a case (such as *Makita*) in which a former client made it "clear that the attorney was aware of specific categories of information" that "extended far beyond" what the former client "would have otherwise revealed," Appx26-27, the facts Plaintiffs alleged "fall far short of establishing 'sufficient uncertainty' of attorney misconduct that necessitates relief under § 1581(i)." Appx27.

The Trade Court imposed an unworkable jurisdictional standard— one at odds with the standard for *proving* the disqualification claims. "A former client is not required to reveal the confidential information learned by the lawyer in order to establish a substantial risk that the lawyer has confidential information to use in the subsequent matter. A

44

conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services." ABA Model R. Prof'l Conduct 1.9 cmt. 3; D.C. R. Prof'l Conduct 1.9 cmt. 3 (same). Tellingly, the Trade Court did not cite *any* authority for the notion that, to establish a substantial risk of harm, a former client must "detail[] the precise nature of the information that the potentially conflicted attorney had acquired" and show how that information is being used against the former client. Appx26. Plaintiffs are unaware of such authority.

The Current Investigations are substantially related to the Predecessor Investigations—both involve FRC products and the same interested parties, markets, fora, laws, and overlapping periods of investigation. The Current Investigations were filed just weeks after the Predecessor Investigations concluded. That substantial relationship should suffice, by itself, to show the manifest inadequacy of Plaintiffs' remedies. The "general weight of authority" is that "where a substantial relationship is found to exist between two adverse matters (and sides) in which the challenged attorney or his firm has participated and will

participate," then "there is a presumption (in the situation of a private lawyer's 'changing sides') that confidential disclosures passed to the challenged lawyer, but that presumption is rebuttable." *EZ Paintr Corp. v. Padco, Inc.*, 746 F.2d 1459, 1461 (Fed. Cir. 1984); *see also Dynamic 3D Geosolutions LLC v. Schlumberger Ltd. (Schlumberger N.V.)*, 837 F.3d 1280, 1287 (Fed. Cir. 2016); *Atasi Corp. v. Seagate Technology*, 847 F.2d 826, 829-30 (Fed. Cir. 1988). After all, "'it is the possibility of the breach of confidence, not the fact of the breach, that triggers disqualification.'" *Kearns v. Fred Lavery Porsche Audi Co.*, 745 F.2d 600, 603 (Fed. Cir. 1984) (quoting *Trone v. Smith*, 621 F.2d 994, 999 (9th Cir. 1980)). If client confidences passed to Pickard—and Plaintiffs verified they did, Appx99-103 ¶¶ 28-40—then "that would plainly be ground for disqualification in the circumstances here." *EZ Painter*, 746 F.2d at 1461. Certainly Pickard never contended that he had *not* received confidences from ARC.

"The substantial relationship test removes the need for courts to make direct inquiry into whether confidential information was actually transmitted." *United States v. Prevezon Holdings Ltd.*, 839 F.3d 227, 239, 241 (2d Cir. 2016). "After finding a substantial relationship exists: 'The Court will assume that during the course of the former representation

confidences were disclosed to the attorney bearing on the subject matter of the representation. *It will not inquire into their nature and extent.*'" *Id.* (quoting *Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 570 (2d Cir. 1973)) (emphasis added).

A higher standard is both unfair and impractical. "'In order to grant a disqualification motion, a court should not require proof that an attorney actually had access to or received privileged information while representing the client in a prior case. Such a requirement would put the former client to the Hobson's choice of either having to disclose his privileged information in order to disqualify his former attorney or having to refrain from the disqualification motion altogether.'" *Id.* at 240-41 (quoting *Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737, 740 (2d Cir. 1978)); *see also Atasi*, 847 F.2d at 830 (to "require a showing of actual shared confidences" would "require the very disclosure the rule is intended to protect against").

A former client should not be required to spell out to its former attorney all of the ways in which shared confidences are sensitive and might be used, or better used, against the former client in a subsequent proceeding. Requiring the former client to advertise which confidences it

47

believes are the potentially most damaging and how the former attorney might exploit them to serve his new client's interests does not simply add insult to injury; it adds injury to injury. For this reason, requiring former clients to identify the confidences they shared with former counsel constitutes reversible error. *See Prevezon*, 839 F.3d at 241 (the "district court erred in shifting the burden to [the former client] to identify confidences it had shared with its counsel," including erring by "fault[ing]" the former client for failing to show "how its confidences would be relevant in the case"); *Chugach Elec. Ass'n v. U.S. Dist. Ct.*, 370 F.2d 441, 444 (9th Cir. 1966) (the district court erred by imposing on the former client "the burden of specifying the secret and confidential information which was available to [its former counsel]").

The Trade Court's jurisdictional pleading standard, moreover, is incompatible with *Makita* itself. Under *Makita*, "'it matters not whether confidences were in fact imparted to the lawyer by the client.'" 819 F. Supp. at 1107 (quoting *Trone*, 621 F.2d at 999). *Makita* thus did not *require* a detailed evidentiary showing, even if one was made. *Makita* emphatically rejected the need for such a showing:

> The former client need show no more than that the
> matters embraced within the pending suit wherein

48

> his former attorney appears on behalf of his
> adversary are substantially related to the matters
> or cause of action wherein the attorney previously
> represented him, the former client. The Court will
> assume that during the course of the former
> representation confidences were disclosed to the
> attorney bearing on the subject matter of the
> representation. *It will not inquire into their nature
> and extent.*

*Id.* at 1105 (quoting *T.C. Theatre Corp. v. Warner Bros. Pictures*, 113 F. Supp. 265, 268 (S.D.N.Y. 1953)) (emphasis added).

To establish manifest inadequacy for purposes of § 1581(i), ARC should not be put to the self-destructive task of identifying the particular confidences it shared with Pickard. In light of the substantial relationship between the Current and Predecessor Investigations, as well as the complex, sensitive nature of the prior representation, it should be presumed "that confidential disclosures passed to the challenged lawyer." *EZ Paintr*, 746 F.2d at 1461. Anything else puts aggrieved clients like ARC on the horns of a dilemma.

To this, the Trade Court countered that a plaintiff always bears the burden of establishing subject-matter jurisdiction under § 1581(i). Appx43-44. But that is just what Plaintiffs have done by demonstrating a substantial relationship between the Predecessor and Current

Investigations (and by pleading additional facts, as discussed *infra*). The substantial relationship, by itself, requires the courts to presume irremediable harm arising from the conflicted representation. "'One recognized form of taint arises when an attorney places himself in a position where he could use a client's privileged information against that client.'" *Prevezon*, 839 F.3d at 241 (quoting *Hempstead Video, Inc. v. Village of Valley Stream*, 409 F.3d 127, 133 (2d Cir. 2005)).

### C.    The Decisional Authorities On Which The Trade Court Relied Do Not Undermine § 1581 Jurisdiction Here.

#### 1.    *Firestone* is not to the contrary.

To support its jurisdictional ruling, the Trade Court looked to the U.S. Supreme Court's decision in *Firestone Tire & Rubber Co. v. Risjord*, which "h[e]ld that orders denying motions to disqualify counsel are not appealable final decisions under § 1291." 449 U.S. 368, 370 (1981). The petitioner in *Firestone* "fail[ed] to supply a single concrete example of the indelible stamp or taint of which it warns." *Id.* at 376. The *Firestone* court also explained that, "should the Court of Appeals conclude after the trial has ended that permitting continuing representation was prejudicial error, it would retain its usual authority to vacate the judgment appealed

from and order a new trial." *Id.* at 378. For several reasons, the Trade Court's reliance on *Firestone* was misplaced.

As an initial matter, the Trade Court stated that Plaintiffs' concern about misuse of confidences in the Current Investigations "is exactly the kind of harm that the *Firestone* Court found insufficient to warrant interlocutory review" because, in the Trade Court's view, Plaintiffs "fail to 'supply a single concrete example of the indelible stamp or taint of which they warn.'" Appx28 (quoting 449 U.S. at 376). But *Firestone* nowhere held that specific client confidences must be identified on the record in order to establish an "indelible stamp" or "taint."

In *Firestone*, the conflicted representation did not even involve substantially related matters. *See* 449 U.S. at 370 & n.3 (the attorney "had occasionally represented the insurer on matters unrelated to the multipiece rim litigation"). By contrast, here, the substantial relationship with the Predecessor Investigations is precisely what taints the Current Investigations, irrespective of any specific confidences. *See, e.g.*, *Dynamic 3D*, 837 F.3d at 1285-87; *Kearns*, 745 F.2d at 603; *EZ Paintr*, 746 F.2d at 1461. If a former client shows a substantial relationship between current and prior legal representations and that its counsel may have received

51

confidential information in the prior representation, then "taint is established." *Prevezon*, 839 F.3d at 239, 241. "[N]o further analysis is necessary." *Id.* at 241. Here, the undeniably substantial relationship between the Predecessor and Current Investigations makes this one of the "situations in which a party will be irreparably damaged if forced to wait until final resolution of the underlying litigation before securing review of an order denying its motion to disqualify opposing counsel." *Firestone*, 449 U.S. at 378 n.13. Regardless, Plaintiffs have in fact offered specific, concrete examples of "taint" (Argument Part III, *infra*).

*Firestone* is inapplicable for another reason. An appellate court "would retain its usual authority to vacate the judgment appealed from and order a new trial." *Id.* at 378. Vacating a *court's judgment* under an appellate court's "usual authority" because of a conflicted representation affords an "adequate" remedy. *Id.* But vacating an *agency's dumping determination* because of a conflicted representation is a different animal. In ordinary civil litigation, the factfinder (a judge or jury) can be replaced after the judgment is vacated. In a trade investigation, the agency adjudicators cannot be replaced. And, again, the Trade Court never explained its legal authority to set aside final determinations so

that the antidumping investigations must be re-commenced *de novo*. Nor did it address § 1581(c)'s limited remit.

*Firestone* is inapplicable for a third reason. The jurisdictional statute at issue there, § 1291, concerns appeals from district courts' "final decisions." But § 1581(i) is not limited to judicial review of "final decisions" and, instead, enables the Trade Court to entertain actions pertaining to preliminary administrative decisions provided there is no challenge to a determination specified in 19 U.S.C. § 1516a. *See NEC*, 151 F.3d at 1368-69.

Subsequent Federal Circuit precedent supports drawing this distinction. The Circuit's appellate jurisdiction is governed by 28 U.S.C. § 1295. "Section 1295's final judgment rule mirrors that of its counterpart found at 28 U.S.C. § 1291." *Nystrom v. TREX Co.*, 339 F.3d 1347, 1350 (Fed. Cir. 2003). Under § 1295, orders denying motions to disqualify (recuse) judges for prejudgment or other bias *are not* immediately appealable. *See Shell Oil Co. v. United States*, 672 F.3d 1283, 1288 (Fed. Cir. 2012); *Strausbaugh v. Merit Sys. Protection Bd.*, 401 F. App'x 524, 526 (Fed. Cir. 2010). Yet the Federal Circuit has held that, under § 1581(i), preliminary administrative decisions denying claims of agency

53

prejudgment or other bias *are* immediately appealable. *See NEC*, 151 F.3d at 1368-69. Under the Trade Court's logic, these two lines of authority should be incompatible because orders denying claims of agency prejudgment are no more "final" than are orders denying claims of judicial prejudgment. The cases are easily reconciled, however, because § 1581(i) is not constrained in the same way as § 1295 (or § 1291).

### 2. *Shakeproof*'s *dictum* is not to the contrary.

Any reliance here on *Shakeproof* is equally misguided. In that case, without actually ruling on the issue, the Federal Circuit expressed "serious doubts" that interlocutory judicial review of a particular agency order denying attorney disqualification was available under § 1581(i). 104 F.3d at 1313. The *Shakeproof* court was, *under the unique facts of that case*, unconvinced that post-determination review would be manifestly inadequate. *Id.*; *but see Univ. of S. Fla.*, 455 F. App'x at 991 & n.1 (post-judgment review of order denying attorney disqualification does not afford a "means of obtaining the relief desired"). In addition to constituting mere *dicta*, *Shakeproof* does not posit a categorical rule against jurisdiction under § 1581(i) where an attorney operates under an ongoing, disabling conflict.

54

To the contrary, *Shakeproof* is easily distinguished on its facts. The aggrieved client there sought to disqualify an attorney's law firm from participating in an antidumping investigation based on the attorney's former employment at the Department during an earlier antidumping investigation. But the accused attorney was "was not personally and substantially involved" in the prior investigation. 104 F.3d at 1313. Post-determination review was adequate because no conflict-induced taint threatened the investigation in the interim. *Id.*

The same cannot be said here. The opposite is true. Here, Pickard was not only involved in the Predecessor Investigations but actually represented ARC. And Pickard is now prosecuting the Current Investigations against ARC's interests. There is obviously a substantial risk that Pickard will use ARC's confidences to the Coalition's unfair advantage, a risk entirely absent from *Shakeproof*.

## III. The Trade Court Erred By Dismissing The Verified Complaint Without Leave To Amend.

The Trade Court should not have required Plaintiffs to "detail[] the precise nature of the information that the potentially conflicted attorney had acquired." Appx26. That is an overly onerous jurisdictional standard. Worse, it is a standard that did not exist at the time the Trade Court

dismissed the case and entered its judgment. Plaintiffs could not have known to detail this information in their pleadings, or even to ask the Court for leave to amend to satisfy the novel jurisdictional standard. For its part, the Court never offered Plaintiffs an opportunity to amend or explained why amendment could not cure perceived inadequacy. It was independent legal error, therefore, for the Trade Court to dismiss the case outright, without first giving Plaintiffs the opportunity to replead in order to support § 1581(i) jurisdiction.

A requirement to plead detailed confidential information was not something Plaintiffs could have gleaned, for example, from *Makita*. As explained above, *Makita* emphatically *rejects* the need for such a showing. *See* 819 F. Supp. at 1105, 1107. Again, "'it matters not whether confidences were in fact imparted to the lawyer by the client.'" *Id.* at 1107 (quoting *Trone*, 621 F.2d at 999). Nor is it a requirement Plaintiffs could have gleaned from *Shakeproof*'s paltry *dictum*, which nowhere explains the circumstances under which § 1581(i) jurisdiction might be proper in matters of attorney disqualification.

Critically, Plaintiffs never argued that they *could* not identify specific client confidences ARC had shared that might be used against

Plaintiffs in the Current Investigations, or how the confidences might be used. Consistent with *Makita* and other authorities, Plaintiffs argued only that they *need* not do so. *See, e.g.*, Appx155. This position notwithstanding, in the related case against the Department, ARC and ASF-K have, in fact, amplified their pleadings, *see* Appx99-103 ¶¶ 28-40, to "detail[] the precise nature of the information that the potentially conflicted attorney had acquired." Appx26. For instance, ARC and Pickard discussed at length how Plaintiffs transact business in Mexico. Because a significant portion of that business consists of FRCs that are attached to railcars in Mexico, the Current Investigations' scope as drafted harms ARC by including FRCs that otherwise would never have been in-scope. Information concerning ARC's sales in Mexico is exactly the sort of information the Coalition can use—and is now using—in the Current Investigations. It goes directly to the dumping margin calculation, among other things.

On appeal, this Court may properly consider these additional facts pursuant to 28 U.S.C. § 1653 ("Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."). That statute "allows appellate courts to remedy inadequate jurisdictional allegations."

*Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 832 (1989). A plaintiff may supplement jurisdictional facts, with relation back to the time of initial filing where, as here, the newly pleaded facts were true at the time of initial filing. *See, e.g., id.* at 831-32; *Schlesinger v. Councilman*, 420 U.S. 738, 745 & n.9 (1975); *Willingham v. Morgan*, 395 U.S. 402, 407 & n.3 (1969). In this regard, the Court may "consider the entire record." *Van Buskirk v. United Group of Cos.*, 935 F.3d 49, 55 (2d Cir. 2019). "Appellate courts have authority to allow amendments to complaints because there is in the nature of appellate jurisdiction nothing which forbids the granting of amendments." *Beer v. United States*, 696 F.3d 1174, 1186 (Fed. Cir. 2012) (cleaned up); *Mojave Desert Holdings, LLC v. Crocs, Inc.*, 995 F.3d 969, 981 (Fed. Cir. 2021).

Regardless of whether this Court permits amendment on appeal, the Trade Court erred. If the Trade Court felt that "Plaintiffs' allegations of attorney misconduct" were "too threadbare to meet the more specific showing that [sic] manifest inadequacy under § 1581(i)," Appx27, then the proper course was to dismiss with leave to amend, not to enter a judgment. It is "common practice" to provide "an opportunity to amend an insufficiently specific complaint after the deficiencies have been

identified." *Cahill v. Merit Sys. Protection Bd.*, 821 F.3d 1370, 1375 (Fed. Cir. 2016); *see also Astornet Technologies Inc. v. BAE Sys., Inc.*, 802 F.3d 1271, 1280 (Fed. Cir. 2015) ("Even if we were to deem the allegations insufficient, the remedy for insufficient specificity, in the ordinary course, would be a dismissal with leave to amend."); *Arthrocare Corp. v. Smith & Nephew, Inc.*, 406 F.3d 1365, 1370 (Fed. Cir. 2005) ("if a claim fails for lack of specificity, the district court should grant leave to amend the complaint, regardless of whether the complainant asks for it"; dismissal without leave to amend is proper "only if the complainant is unable or unwilling to amend"). The Trade Court's own Rules dictate that it should "freely give leave" to amend "when justice so requires." C.I.T. R. 15(a)(2).

Although "the grant or denial of an opportunity to amend is within the [court's] discretion," an "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion." *Foman v. Davis*, 371 U.S. 178, 182 (1962). The Trade Court abused its discretion in this regard.

## CONCLUSION

The Court should expedite this appeal, reverse the Trade Court's judgment, and remand the case for further proceedings.

Dated: January 13, 2023

Andrew T. Schutz
Ned H. Marshak
GRUNFELD, DESIDERIO,
LEBOWITZ, SILVERMAN &
KLESTADT LLP
599 Lexington Avenue, 36th Floor
New York, NY 10022
(212) 557-4000

*Counsel for Plaintiff*
*Strato, Inc.*

Jay I. Alexander
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

*Counsel for Plaintiff*
*TTX Company*

Respectfully submitted,

*/s/ Richard P. Ferrin*
Douglas J. Heffner
Brian P. Perryman
Richard P. Ferrin
FAEGRE DRINKER
BIDDLE & REATH LLP
1500 K Street, NW, Suite 1100
Washington, DC 20005
(202) 230-5000

*Counsel for Plaintiffs*
*Amsted Rail Company, Inc. and*
*ASF-K de Mexico S. de R.L. de C.V.*

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(b). The brief contains 11,680 words, excluding the part of the brief exempted by Fed. R. App. P. 32(a)(7)(b)(iii) and Fed. Cir. R. 32(b).

The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Office for Microsoft 365 in 14-point Century Schoolbook type.

*/s/ Richard P. Ferrin*
Richard P. Ferrin

# CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the Court's CM/ECF system.

*/s/ Richard P. Ferrin*
Richard P. Ferrin

US.354700718.02